# Exhibit C-1

ASSET PURCHASE AGREEMENT

Between

GOLDEN STAR ELECTRONICS, LLC
a Delaware Limited Liability Company,
as Buyer

and

CREDIT MANAGERS ASSOCIATION OF CALIFORNIA, a California corporation,
doing business as Credit Management Association, solely in its capacity as
Assignee for the Benefit of Creditors of Westinghouse Digital Electronics, LLC,
as Seller

Dated as of April _____, 2010

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..................................................................................................... 1
    1.1    Certain Defined Terms ........................................................................................... 1
    1.2    Table of Definitions ............................................................................................... 3

ARTICLE II PURCHASE AND SALE ...................................................................................... 4
    2.1    Purchase and Sale of the Purchased Assets ........................................................... 4
    2.2    Purchased Assets ................................................................................................... 4
    2.3    Excluded Assets .................................................................................................... 6
    2.4    Assumed Liabilities .............................................................................................. 7
    2.5    Excluded Liabilities .............................................................................................. 7
    2.6    Consideration ........................................................................................................ 8
    2.7    Closing .................................................................................................................. 8
    2.8    Allocation of Purchase Price ................................................................................ 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF BUYER. .............................. 9
    3.1    Corporate Organization ........................................................................................ 9
    3.2    Power and Authority; No Default ......................................................................... 9
    3.3    Limitation of Warranties ...................................................................................... 9
    3.4    As-Is Transaction .................................................................................................. 9
    3.5    Restricted Securities ........................................................................................... 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER. ........................... 10
    4.1    Corporate Organization ...................................................................................... 10
    4.2    Power and Authority; No Default Upon Transfer .............................................. 11
    4.3    General Assignment ........................................................................................... 11
    4.4    No Insolvency Proceedings ................................................................................ 11

ARTICLE V COVENANTS .................................................................................................... 11
    5.1    Waiver of Bulk Sales Compliance ..................................................................... 11
    5.2    Taxes and Any Other Charges Related to the Sale ............................................ 11
    5.3    Retention of Assignor's Employees ................................................................... 11
    5.4    Books and Records ............................................................................................ 12
    5.5    No Subrogation ................................................................................................... 12
    5.6    Further Assurances ............................................................................................. 12
    5.7    Press Releases, Public Announcements and Third Party Disclosures ............... 13
    5.8    No Obligations to Third Parties .......................................................................... 13
    5.9    Satisfaction or Release of Assumed Liabilities. ................................................ 13

ARTICLE VI CONDITIONS TO CLOSING .......................................................................... 14
    6.1    Conditions to Buyer's Obligations ..................................................................... 14
    6.2    Conditions to Seller's Obligations ..................................................................... 14

## Table of Contents
## (Continued)

|  |  | Page |
|---|---|---|
| ARTICLE VII | INDEMNIFICATION | 15 |
| 7.1 | Survival of Representations and Warranties | 15 |
| 7.2 | Indemnification by Buyer | 15 |
| 7.3 | Procedures | 16 |
| ARTICLE VIII | MISCELLANEOUS. | 17 |
| 8.1 | Costs and Expenses | 17 |
| 8.2 | Notices | 18 |
| 8.3 | Entire Agreement; Captions | 19 |
| 8.4 | Amendment | 19 |
| 8.5 | Waiver | 19 |
| 8.6 | Execution in Counterparts | 19 |
| 8.7 | Assignment; Binding Effect; Successors | 19 |
| 8.8 | Governing Law | 20 |
| 8.9 | Dispute Resolution | 20 |
| 8.10 | Severability | 21 |
| 8.11 | Attorneys' Fees | 21 |
| 8.12 | No Presumption Against Drafting Party | 21 |
| 8.13 | Facsimile Signature | 21 |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of April _____, 2010 (the "**Effective Date**"), by and between CREDIT MANAGERS ASSOCIATION OF CALIFORNIA, a California corporation doing business as Credit Management Association, ("**Seller**"), solely in its capacity as Assignee for the Benefit of Creditors of Westinghouse Digital Electronics, LLC, a California limited liability company ("**Assignor**" or "**Company**"), and GOLDEN STAR ELECTRONICS, LLC, a Delaware limited liability company ("**Buyer**"). The Seller and the Buyer may be referred to herein as a "**Party**" or collectively as the "**Parties**."

### RECITALS

WHEREAS, Assignor has operated a business engaged in the distribution of consumer electronic products (the "**Business**");

WHEREAS, on April __, 2010 (the "**Assignment Date**") Assignor executed a general assignment for the benefit of its creditors pursuant to California law (the "**General Assignment**") in favor of Seller and transferred ownership of all of its right, title, and interest in and to all of its properties and assets of every kind and nature, real, personal or mixed, tangible or intangible, wherever located (collectively, the "**Assets**") to Seller;

WHEREAS, one (1) day prior to the Assignment Date, the Assignor terminated all of its employees and independent contractors and took other customary steps in preparation for the General Assignment; and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

1.1     **Certain Defined Terms**. For the purposes of this Agreement:

(a)     "**Ancillary Agreements**" means the Bill of Sale, the Assumption Agreement and the Security Agreement.

(b)     "**Assumption Agreement**" means an instrument of assignment and assumption in form reasonably satisfactory to the Buyer and the Seller pursuant to which the Seller shall assign to the Buyer and the Buyer shall assume the Assumed Liabilities as of the Closing Date.

1

(c) **"Bill of Sale"** means a bill of sale and general assignment in form reasonably satisfactory to the Buyer and the Seller transferring to the Buyer all of the tangible and intangible personal property and other assets owned or held by the Seller as of the Closing Date that is included in the Purchased Assets.

(d) **"Closing"** means the closing of the transfer of the Purchased Assets from Seller to Buyer upon the payment of the Purchase Price by Buyer to Seller, Buyer's assumption of the Assumed Liabilities, and the satisfaction or waiver by the applicable Party of the conditions set forth in Sections 8.1 and 8.2.

(e) **"Closing Date"** means the date on which the Closing occurs, which shall be mutually agreed between Buyer and Seller.

(f) **"Good Faith Deposit"** means the good faith deposit paid by Buyer to Seller prior to the execution of this Agreement in the amount of Ten Thousand Dollars ($10,000.00).

(g) **"Governmental Authority"** means any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

(h) **"Governmental Permit(s)"** means all material licenses, permits, franchises, privileges, immunities, approvals and other authorizations issues from or by any Governmental Authority which are necessary to entitle Buyer to own, lease, operate and use the Purchase Assets or the Business.

(i) **"Intellectual Property"** means all intellectual property rights arising under the laws of the United States or any other jurisdiction with respect to the following: (i) trade names, trademarks and service marks (registered and unregistered), domain names, trade dress and similar rights and applications to register any of the foregoing (collectively, **"Marks"**); (ii) patents and patent applications and rights in respect of utility models or industrial designs (collectively, **"Patents"**); (iii) copyrights and registrations and applications therefore (collectively, **"Copyrights"**); and (iv) know-how, inventions, artwork, processes, marketing material, designs, manuals, schematics, blueprints, drawings discoveries, methods, technical data, specifications, research and development information, technology, data bases and other proprietary or confidential information (including ideas, research and development, customer lists manufacturing, engineering and unpatented technology) in each case that derives economic value from not being generally known to other Persons who can obtain economic value from its disclosure, but excluding any Copyrights or Patents that cover or protect any of the foregoing (collectively, **"Trade Secrets"**).

(j) **"Person"** means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

(k) **"Security Agreement"** means a security agreement in a form reasonably satisfactory to the Buyer and the Seller granting a security interest in certain of Buyer's assets in favor of Seller.

(l) **"Subsidiary"** means, with respect to any Person, any other Person of which at least 50% of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by such first Person.

1.2   **Table of Definitions**.  The following terms have the meanings set forth in the Sections referenced below:

| | |
|---|---|
| *Agreement* | *Preamble* |
| *Arbitrator* | *8.9(a)* |
| *Assets* | *Preamble* |
| *Assignment Date* | *Preamble* |
| *Assignor* | *Preamble* |
| *Assignor Indemnified Parties* | *7.2(c)* |
| *Assumed Liabilities* | *2.4* |
| *Business* | *Preamble* |
| *Buyer* | *Preamble* |
| *Company* | *Preamble* |
| *Effective Date* | *Preamble* |
| *Excluded Assets* | *2.3* |
| *General Assignment* | *Preamble* |
| *Indemnified Party* | *7.3(a)* |
| *Leased Property* | *5.6(c)* |
| *Losses* | *7.2(a)* |
| *Notices* | *8.2* |
| *Parties* | *Preamble* |
| *Party* | *Preamble* |
| *Product Units* | *2.6(c)* |
| *Purchase Price* | *2.6(a)* |
| *Purchased Assets* | *2.2* |
| *Quarterly Royalty Participation Payment* | *2.6(c)* |
| *Royalty Participation Payment* | *2.6(c)* |
| *Sales Tax Liabilities* | *5.2* |
| *Securities Act* | *3.5* |
| *Security Interest* | *2.6(c)* |
| *Seller* | *Preamble* |
| *Seller Indemnified Parties* | *7.2(a)* |
| *Software* | *2.2(n)* |
| *Third Party Claim* | *7.3(a)* |

## ARTICLE II
## PURCHASE AND SALE

2.1     **Purchase and Sale of the Purchased Assets**.

Upon the terms and subject to the conditions of this Agreement, at the Closing, and in reliance on the representations, warranties and covenants set forth in this Agreement, Seller shall sell, assign, transfer, convey and deliver to the Buyer all of the Seller's right, title and interest as of the Closing Date in and to the Purchased Assets, and the Buyer shall purchase, acquire, accept and pay for the Purchased Assets and assume the Assumed Liabilities. The Purchased Assets are sold, assigned, transferred, conveyed and delivered to Buyer on as "as is," "where is" basis, without any warranty or representations of any nature whatsoever. Without limiting the generality of the foregoing, Seller makes no representation or warranty as to the suitability of the Purchased Assets for any intended use, projection, result or outcome of any business operation by the Buyer or any profit loss, expense or income that might result from the Buyer's use or acquisition of the Purchased Assets.

2.2     **Purchased Assets**. As used in this Agreement, the term "**Purchased Assets**" means any and all of Seller's right, title and interest, if any, in and to all of the Assets (wherever located) as they exist at the time of the Closing, other than the Excluded Assets. The Purchased Assets include, without limitation:

(a)     Any and all tangible and intangible personal property assets acquired by Seller from Assignor used in the operation of the Business, including without limitation all machinery and equipment, special tools, furniture, fixtures, inventory and work in process but excluding the inventory expressly described in Section 2.3(l) below.

(b)     Any and all intangible assets acquired by Seller from Assignor including, without limitation, customer lists, vendor lists, licensing and trademark rights to the name "Westinghouse Digital Electronics" and the rights to use the name "Westinghouse" under that certain Trade Name License with Westinghouse Electric Corporation.

(c)     Any and all rights acquired by Seller from Assignor under the contracts and agreements described in Schedule 2.2(c) attached hereto and by this reference incorporated herein, subject to, in all cases, applicable restrictions and necessary consents of third parties.

(d)     Any and all Intellectual Property acquired by Seller from Assignor concerning the Business, including, without limitation, the Intellectual Property set forth in Schedule 2.2(d) attached hereto and by this reference incorporated herein. Such Intellectual Property includes, without limitation, any Patents, Copyrights, Mark and Trade Secrets relating to the Business.

(e)     Any and all rights acquired by Seller from Assignor in the Assignor's Subsidiaries that are described in Schedule 2.2(e) attached hereto and by this reference incorporated herein.

(f)     Any and all rights acquired by Seller from Assignor that are deemed by Buyer in writing to be necessary or desirable in connection with the operation of the Business; provided,

4

however, that as a condition to Buyer's acquisition of such rights, Buyer shall agree to assume any obligations expressly associated with such asset(s).

(g) Any and all rights acquired by Seller from Assignor under any and all warranties, claims, causes of action, choses in action, covenants and other similar claims and interests of Seller against third parties including, without limitation, any liens, security interests, or other rights to payment or to enforce payment in connection with the Purchased Assets or the Assumed Liabilities; provided, that Buyer shall not acquire the causes of action, choses in action or similar claims and interests relating to the matters described in Section 2.3(n).

(h) Any and all rights acquired by Seller from Assignor of any prepaid charges, deposits, sums and fees and all rights to refunds pertaining to the Purchased Assets or the Assumed Liabilities.

(i) Any and all of Seller's right title and interest in and to the Governmental Permits, to the extent such Governmental Permits are transferable.

(j) Any and all rights acquired by Seller from Assignor in the telephone and facsimile numbers of Assignor (subject to approval by the telephone service provider(s)).

(k) Any and all rights acquired by Seller from Assignor in Assignor's world wide web domain names as described in Schedule 2.2(k) attached hereto and by this reference incorporated herein.

(l) Any and all rights acquired by Seller from Assignor in Assignor's inventory of advertising, sales and customer materials, forms, labels, promotional materials, manuals and supplies used in the operation of the Business.

(m) Subject to the rights of Seller under Section 5.4, any and all rights acquired by Seller from Assignor in Assignor's books and records (including, without limitation, sales records, data processing records, employment and personnel records, customer lists, files and records, advertising and marketing data and records, credit records, and records relating to suppliers), credit information, domain names, customer account information, user names, passwords, real names, postal and email addresses, telephone and facsimile numbers, customer credit card information, and billing history relating to such customers and vendors, books of account, files, invoices, inventory records, accounting records, maintenance, operating and production records, customer lists, supplier lists, business plans, catalogs, quality control records and manuals, blueprints, research and development files, laboratory books, patent and trademark files and litigation files, wherever located, whether in hard copy or electronic form, other than records kept for tax purposes and excluding any of the foregoing relating to, or included in, the Excluded Assets.

(n) Any and all rights acquired by Seller from Assignor in Assignor's computer software (including proprietary and third party software) associated with the operation of the Business (the "**Software**"); subject to, in all cases, applicable restrictions and necessary consents of third parties. Buyer acknowledges that use of any Software may require additional

5

consideration to be provided by Buyer to an applicable licensor, and in each case Buyer agrees to pay such additional consideration to the extent Buyer desires to use such Software.

(o) Any and all rights acquired by Seller from Assignor in the goodwill of the Business, including all of Assignor's customer and vendor lists.

(p) Any and all rights acquired by Seller from Assignor in the notes receivable described in Schedule 2.2(p) attached hereto and by this reference incorporated herein.

(q) Any and all accounts receivable due to Seller (whether short-term or long-term), together with any unpaid interest or fees accrued thereon or other amounts due with respect to thereto other than as described in Section 2.3(k).

2.3 **Excluded Assets.** Notwithstanding anything contained in this Agreement to the contrary, the Seller is not selling, and the Buyer is not purchasing, any assets other than those specifically listed or described in Section 2.2, and without limiting the generality of the foregoing, the term "Purchased Assets" shall expressly exclude the following assets of the Seller, all of which shall be retained by the Seller (collectively, the "**Excluded Assets**"):

(a) the capital stock of Assignor;

(b) any of Seller's rights under this Agreement;

(c) any non-assignable Governmental Permits and other authorizations from a Governmental Authority;

(d) any and all of the Seller's cash and cash equivalents;

(e) any and all of the Seller's bank accounts;

(f) Assignor's corporate seals, minute books, charter documents, corporate stock record books, tax and financial records and such other books and records as pertain to the organization, existence or share capitalization of Assignor (it being understood that Buyer will receive copies of the financial records as they pertain to Purchased Assets);

(g) any real property leases and subleases;

(h) the contracts and agreements described in Schedule 2.3(h) attached hereto and by this reference incorporated herein;

(i) all rights, claims and causes of action relating to any Excluded Asset;

(j) all claims arising under California Code of Civil Procedure Section 1800 and California Civil Code Sections 3439 et seq., and other similar provisions are specifically excluded and shall remain property of the Seller;

(k) The accounts receivable due to Seller that are expressly described in Schedule 2.3(k) attached hereto and by this reference incorporated herein;

(l) The inventory that is expressly described in Schedule 2.3(l) attached hereto and by this reference incorporated herein

(m) Any personal property leases;

(n) Any and all rights acquired by Seller from Assignor under any warranties, claims, causes of action, choses in action, covenants and other similar claims and interests of Seller against third parties to the extent that such rights are the subject of the litigation matters and claims expressly described in Schedule 2.3(n) attached hereto and by this reference incorporated herein;

(o) any other assets, properties rights and interests of the Assignor that were not acquired by the Seller pursuant to the General Assignment.

2.4 **Assumed Liabilities.** In connection with the purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the Buyer shall assume and pay, discharge, perform or otherwise satisfy the following liabilities and obligations of the Seller relating to the Business (the "**Assumed Liabilities**"):

(a) [intentionally omitted]

(b) all liabilities of Seller for all unpaid payroll, accrued but unpaid vacation pay, accrued but unpaid sick pay and taxes accrued thereon of those Persons who were employees or independent contractors of Assignor immediately prior to the Assignment Date but excluding any liability for any penalties relating to such matters; and

(c) the liabilities expressly set forth in Schedule 2.4(c) attached hereto and by this reference incorporated herein.

2.5 **Excluded Liabilities.** Notwithstanding any other provision of this Agreement to the contrary, the Buyer shall not assume or in any way be liable or responsible for any liabilities or obligations of Assignor of any nature whatsoever, including, without limitation, any obligations of Assignor resulting from events which have occurred, or will occur, prior to the Closing Date other than the Assumed Liabilities. Without limiting the generality of the foregoing, except for as provided to the contrary in this Agreement and other than the Assumed Liabilities, the Buyer shall not assume any of the following liabilities, obligations or commitments of Assignor: (a) any tax liabilities or similar assessments arising from the conduct or operation of the Business or from occurrences prior to the Closing Date, (b) any liability with respect to any claim, suit, action or judicial or arbitration proceeding (whether known or unknown, contingent or non-contingent, inchoate or not) made or commenced against Assignor and/or Seller at or prior to the Closing Date or made or commenced after the Closing Date, to the extent that such claim, suit, action or proceeding arises out of or relates to any action, omission or condition occurring or existing prior to the Closing Date; or (c) any claim based upon product

7

liability arising out of a product manufactured (in whole or in part) or service performed (in whole or in part) by Assignor prior to the Closing Date.

  2.6 **Consideration**.  In full consideration for the sale, assignment, transfer, conveyance and delivery of the Purchased Assets to the Buyer at the Closing, the Buyer shall:

  (a) pay to the Seller by wire transfer, to a bank account designated in writing by the Seller to the Buyer, an amount equal to Five Hundred Thousand Dollars ($500,000), less the Good Faith Deposit (the "**Purchase Price**") in immediately available funds in United States dollars;

  (b) assume the Assumed Liabilities; and

  (c) pay to Seller an additional One Million Five Hundred Thousand Dollars ($1,500,000) (the "**Royalty Participation Payment**").  Each financial quarter, until the total amount of the Royal Participation Payment is paid, Buyer shall make a payment to Seller (each a "**Quarterly Royalty Participation Payment**") in the amount of $1.50 multiplied by the number of Product Units sold by the Buyer during the preceding financial quarter.  For purposes of the foregoing sentence, the term "**Product Units**" is hereby deemed to mean television units and shall not include ancillary devices (such as remote control devices).  Each such Quarterly Participation Payment shall be paid by Buyer to Seller within thirty (30) days following the close of each financial quarter (commencing as of July 30, 2010).  Until the Royalty Participation Payment is paid in full, all unpaid amounts shall bear interest at a rate of six percent (6%) per annum.  To secure the punctual payment and performance of the obligations set forth in this Section 2.6(c) when due whether at the stated maturity, by acceleration or otherwise, the Buyer hereby grants to Seller a security interest (the "**Security Interest**") in and to, and a lien upon all right, title and interest of the Buyer in (i) all inventory presently owned or hereinafter acquired by the Buyer and wherever located, (ii) all proceeds of such inventory in whatever form, whether derived from voluntary or involuntary disposition and (iii) all products of such inventory.  The value advanced by Seller is for the purpose of purchasing certain of the inventory that is collateral for this Security Interest, specifically the inventory which is included within the Purchased Assets.  The Parties intend that Seller shall have a purchase money security interest in such inventory; provided, however, that Buyer shall be entitled to sell such inventory in the normal course of business free and clear of the Security Interest.  Seller shall have the right upon reasonable advance notice and during normal business hours, to cause a certified independent accounting firm to perform an audit of Buyer's books and records that relate to the payments set forth in this section for the sole purpose of verifying the payments received hereunder.  Seller shall have the right to cause such accounting firm to perform such an audit once in each twelve month period during which any payments referenced in this Section 2.6 is due.

  2.7 **Closing**.  The Closing shall take place at the offices of Gibson, Dunn & Crutcher LLP, 333 South Grand Ave. Suite 4700, Los Angeles, California, 90071 at approximately 1:00 p.m. PST, on the Closing Date, or at such other time, date or place, or such other means of exchanging documents, as may be agreed upon by the Parties.  The Parties hereby acknowledge that the Closing shall be effective at such time as the conditions set forth in Sections 8.1 and 8.2 have been satisfied or otherwise waived in writing by the applicable Party.

2.8     **Allocation of Purchase Price**. Within thirty (30) days following the Closing Date, Buyer shall, in its reasonable discretion, allocate the Purchase Price among the Purchased Assets for which there is not certificated title. Seller agrees to accept, for all tax, regulatory and financial reporting purposes, Buyer's reasonable allocation of the Purchase Price. Seller further agrees to cooperate with Buyer regarding Buyer's allocation of the Purchase Price as set forth herein.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER.

The Buyer hereby represents and warrants to the Seller as follows:

3.1     **Corporate Organization**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.

3.2     **Power and Authority; No Default**. Buyer has all necessary corporate power and authority to enter this Agreement and all other documents that Buyer is required to execute and deliver hereunder, and holds all permits, licenses, orders and approvals of all federal, state and local governmental or regulatory bodies necessary and required therefore. The execution, delivery and performance by Buyer of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by Buyer by all necessary corporate action of Buyer. This Agreement, when executed and delivered by Buyer, will be duly and validly executed and delivered and will be the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Neither the execution and delivery of this Agreement nor the performance by Buyer of its obligations under this Agreement, will: (a) violate Buyer's Operating Agreement or other organizational documents, (b) to the best of Buyer's knowledge, violate any law, statute, rule or regulation or order, writ, judgment, injunction or decree of any court, administrative agency or government body applicable to Buyer, or (c) violate or conflict with any other restriction to or obligation which Buyer is subject.

3.3     **Limitation of Warranties**. Except as specifically set forth in this Agreement, Buyer acknowledges and agrees that Seller has made no other representation or warranty, expressed or implied, to Buyer.

3.4     **As-Is Transaction**. Buyer acknowledges and agrees to accept the Purchased Assets "As is," "Where is," "Without recourse" and "WITH ALL FAULTS, LIENS AND ENCUMBRANCES." Without limiting the generality of the foregoing sentence, Buyer acknowledges that, except as otherwise expressly set forth in this Agreement:

(A) BUYER IS ELECTING TO PURCHASE THE PURCHASED ASSETS IN AN "AS-IS", "WHERE-IS" CONDITION AS OF THE CLOSING, SUBJECT TO ALL FAULTS, CIRCUMSTANCES, CONDITIONS AND DEFECTS; (B) SELLER HAS NO OBLIGATION TO REPAIR OR CORRECT ANY SUCH FACTS, CIRCUMSTANCES, CONDITIONS OR DEFECTS OR TO COMPENSATE BUYER FOR THE SAME; (C) BUYER HAS, OR SHALL HAVE PRIOR TO CLOSING, UNDERTAKEN ALL SUCH PHYSICAL INSPECTIONS AND EXAMINATIONS WHICH BUYER DEEMS NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES, INCLUDING,

BUT NOT LIMITED TO, A REVIEW OF THE STATUS OF TITLE TO THE PURCHASED ASSETS, AND THAT, BASED UPON THE SAME, BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON ITS OWN SUCH INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS AGENTS AND OFFICERS; (D) SELLER IS NOT MAKING AND HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO THE PHYSICAL CONDITION OR THE FITNESS FOR ANY PARTICULAR PURPOSE OF ALL OR ANY PART OF THE PURCHASED ASSETS; AND (E) SELLER HAS NOT MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE PURCHASED ASSETS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES).

3.5   **Restricted Securities.**  To the extent the Purchased Assets may include securities subject to the Securities Act of 1933, as amended (the "**Securities Act**"), the Buyer (a) acknowledges that such securities and the transactions contemplated by this Agreement, have not been registered under the Securities Act or any state securities laws, and that such securities are being offered and sold in reliance upon exemptions provided in the Securities Act and state securities laws for certain transactions and cannot be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless they are subsequently registered and qualified under the Securities Act and applicable state laws or unless an exemption from such registration and qualification is available, and (b) is purchasing any such securities for investment purposes only for its own account and not with any view toward a distribution thereof or with any intention of selling, distributing or otherwise disposing of any such securities in a manner that would violate the registration requirements of the Securities Act.  The Buyer is able to bear the economic risk of holding any such securities for an indefinite period and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment in any such securities.  The Buyer understands that no public market exists for any such securities, and that there is no assurance that a public market will ever develop for any such securities.  The Buyer has received all such information regarding the purchase of any such securities as it deems necessary to make a decision with respect to the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER.

The Seller hereby represents and warrants to the Buyer as follows:

4.1   **Corporate Organization**.  Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of California.

4.2   **Power and Authority; No Default Upon Transfer**.  Seller has all necessary corporate power and authority to execute and deliver, as assignee, this Agreement and to perform its obligations hereunder.  The execution, delivery and performance by Seller of this Agreement, and the consummation of all the transactions contemplated hereby have been duly and validly authorized by Seller by all necessary corporate actions of Seller.  Seller has received copies of resolutions of the board of directors, shareholders and members, as applicable, of the Assignor authorizing the General Assignment.  This Agreement, when executed and delivered by Seller, will be duly and validly executed and delivered and will be the valid and binding obligation of Seller, enforceable against Seller, in accordance with its terms.  Neither the execution and delivery of this Agreement by Seller, nor the performance by Seller of its obligations under this Agreement, will violate Seller's Articles of Incorporation or Bylaws.

4.3   **General Assignment**.  A true, correct, and complete copy of the General Assignment is attached hereto as Exhibit A.  To the best of Seller's knowledge, such General Assignment is in full force and effect and has not been revoked, rescinded, or modified.

4.4   **No Insolvency Proceedings**.  To Seller's knowledge, other than as reflected in the General Assignment, the Assignor has not: (a) filed a petition in bankruptcy; (b) been adjudicated insolvent or bankrupt, petitioned or applied to any tribunal for any receiver of or any trustee for itself or any substantial part of its property, (c) commenced any proceeding relating to itself under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, nor has any such proceeding been commenced against Assignor, nor (d) by any act, indicated its consent to, approval of, or acquiescence in, any such proceeding or the appointment of any receiver or any trustee.

## ARTICLE V
## COVENANTS

5.1   **Waiver of Bulk Sales Compliance**.  It is the understanding and belief of both Buyer and Seller that the transactions contemplated by this Agreement are not subject to the "bulk sale" law set forth in Article 6 of the California Commercial Code.  Notwithstanding, to the extent that the "bulk sale" law set forth in Article 6 of the California Commercial Code or any similar law is applicable, Buyer waives any and all rights to require compliance with the provisions of such laws in connection with the transactions contemplated by this Agreement.

5.2   **Taxes and Any Other Charges Related to the Sale**.  Buyer shall pay to Seller all sales, transfer, use or other taxes (except income taxes), duties, claims or charges payable as a result of the transactions contemplated by this Agreement (the "**Sales Tax Liabilities**") not less than two weeks before any such Sale Tax Liability becomes due and owing.

5.3   **Retention of Assignor's Employees**.  In addition to assuming all liabilities set forth in Section 2.4(b), Buyer shall, immediately following the Closing Date, offer to hire all Persons who were employees or independent contractors of Assignor immediately prior to the Assignment Date and provide such employees and independent contractors "like kind" or similar types of jobs, wages, benefits, and employment terms as provided by Assignor immediately prior to the Assignment Date.

11

5.4    **Books and Records.** Buyer agrees (a) to preserve all of the books and records of Seller existing on the Closing Date and included in the Purchased Assets and not to destroy or dispose of any such books and records for a period of seven (7) years from the Closing Date or such longer time as may be required by law, and thereafter, if it desires to destroy or dispose of such books and records, to offer first in writing at least sixty (60) days prior to such destruction or disposition to surrender them to Seller; and (b) following the Closing Date, to afford Seller, its accountants and counsel during normal business hours, upon reasonable request, at any time, reasonable access to such books, records and other data and to the employees of Buyer to the extent that such access may be requested for any legitimate purpose at no cost to Seller (other than for reasonable out-of-pocket expenses); provided, however, that nothing herein shall limit any of Seller's rights of discovery and such access shall not disrupt the personnel or operations of Buyer.

5.5    **No Subrogation.** Buyer acknowledges and agrees that the assumption of the Assumed Liabilities shall not entitle Buyer to any rights of subrogation with respect to the Assumed Liabilities. Buyer further agrees to refrain from exercising, or attempting to exercise, any rights of subrogation, to the extent such rights may exist, with respect to the Assumed Liabilities.

5.6    **Further Assurances.**

(a)    On or after the Closing Date, Seller shall, at Buyer's sole expense, (i) deliver to Buyer such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer and its counsel, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all of the Purchased Assets and to complete all other transfers and assumptions as are contemplated hereby, and (ii) take all steps as Buyer may reasonably request to put Buyer in actual possession and control of the Purchased Assets. From time to time following the Closing, at Buyer's sole expense, Seller shall execute and deliver, or cause to be executed and delivered, to Buyer such other instruments of conveyance and transfer as Buyer may reasonably request to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Purchased Assets.

(b)    Following the Closing, at Buyer's sole expense, each Party agrees to cooperate fully with the other Party and to execute such further instruments, documents and agreements, and to give such further written assurances, as may be reasonably requested by any other Party to better evidence and reflect the transactions described herein and to carry into effect the intents and purposes of this Agreement, including, without limitation, any requisite filings by Assignor with the California Secretary of State to effect the name change of the Assignor from "Westinghouse Digital Electronics, LLC" to "WDE Electronics, LLC" (which shall be at Assignor's sole expense), and any requisite filings in the domestic and/or foreign jurisdictions for the Assignor's Subsidiaries as referenced in Schedule 2.2(e) attached hereto and by this reference incorporated herein (which shall be at Buyer's sole expense).

(c)    Without limiting Section 5.6(b), such further assurances shall also include, as to Buyer, making reports to Seller regarding the renewal or termination of any real property