# Roberg-Perez Decl. Ex. F

## March 7, 2011

## Best Buy's Opposition to Plaintiffs' Preliminary Injunction Motion

Erik Andersen - 10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

09-CV-10155 (SAS)

------------------------------------

SOFTWARE FREEDOM CONSERVANCY, INC.
and ERIK ANDERSEN,

              Plaintiffs,

   -against-

BEST BUY CO., INC., SAMSUNG ELECTRONICS AMERICA, INC., WESTINGHOUSE DIGITAL ELECTRONICS, LLC, JVC AMERICAS CORPORATION, WESTERN DIGITAL TECHNOLOGIES, INC., ROBERT BOSCH LLC, PHOEBE MICRO, INC., HUMAX USA, INC., COMTREND CORPORATION, DOBBS-STANFORD CORPORATION, VERSA TECHNOLOGY, INC., ZYXEL COMMUNICATIONS, INC., ASTAK, INC. and GCI TECHNOLOGIES CORPORATION,

              Defendants

------------------------------------

    VIDEOTAPED DEPOSITION OF ERIK ANDERSEN

         New York, New York

       Friday, October 29, 2010

**CERTIFIED TRANSCRIPT**

Reported by:
Amy A. Rivera, CSR, RPR, CLR
JOB NO. 25509

Erik Andersen   -   10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 30

1  Lineo?
2     A.   Yes, I see that.
3     Q.   And is that description accurate?
4          MR. RAVICHER:  Objection.
5          Is what description?
6     Q.   Is the title, "Senior software
7  developer" at Lineo accurate?
8     A.   Yes, I believe that that was the
9  official title that I was given.
10    Q.   And are the dates August 1999 to
11 September 2001 accurate dates as to your
12 affiliation with Lineo?
13    A.   Yes, that I believe is correct.
14         And it's kind of ironic.  I was -- as
15 they ran into some financial trouble, I was let go
16 one week before September 11, 2001.  So ...
17    Q.   Directing your attention back to Erik
18 Andersen's home page on Page 2.
19    A.   Okay.
20    Q.   Toward the top of that page, do you
21 see that there is reference to you leaving
22 employment at Lineo on September 7th, 2001?
23    A.   Yes, I see that.
24    Q.   So that --
25    A.   So, I suppose it wasn't precisely one

Page 31

1  week before, it was less than a week before.
2     Q.   To the best of your recollection, is
3  that the date that you left employment at Lineo?
4     A.   I imagine it must be.
5     Q.   Okay.
6          You mentioned that Lineo was a
7  business for embedded Linux?
8     A.   That is correct.  That was the reason
9  for which the business was -- was -- the market
10 that that business was hoping to target.
11    Q.   Does Lineo still exist?
12    A.   I have no knowledge of whether some
13 derivative or successor or whatever may or may not
14 still exist.
15         The way of businesses, or -- who
16 knows, somebody might own the leftovers.
17    Q.   And is it your testimony that you have
18 no knowledge of who might own the leftovers?
19    A.   I have no knowledge.
20    Q.   Okay.
21         Going back to your resume, and looking
22 at the entry for your work at Lineo, you have
23 written, "Team lead for developing Embedix Linux
24 1.0."
25         MR. RAVICHER:  For the record,

Page 32

1  "Embedix" is spelled E-M-B-E-D-I-X.
2     Q.   Mr. Andersen, did I read that
3  correctly?
4          MR. RAVICHER:  Counsel, do you mind
5  reading -- redirecting the witness?
6     Q.   Toward the top of Exhibit 2 --
7     A.   Okay, okay.  There we are.
8          Could you restate the question again
9  now that I found where we're --
10    Q.   Okay.
11         You have in this resume indicated that
12 you were "Team lead for developing Embedix Linux
13 1.0."
14         Did I read that correctly?
15    A.   Yes, you did.
16    Q.   And is that an accurate description of
17 some of what you did at Lineo?
18    A.   That -- yes.
19    Q.   You have also indicated a number of
20 other responsibilities that you had while you were
21 at Lineo in this resume, correct?
22    A.   That's right.
23    Q.   And one of these responsibilities that
24 is identified on this resume is "Maintainer and
25 developer of BusyBox," correct?

Page 33

1          MR. RAVICHER:  For the record, the
2          statement is "Maintainer and developer of
3          BusyBox (http://busybox.lineo.com)."
4  BY MS. ROBERG-PEREZ:
5     Q.   Did -- my question is:  Did you
6  maintain and develop BusyBox while you were at
7  Lineo?
8          MR. RAVICHER:  Objection.
9          MS. ROBERG-PEREZ:  I'll rephrase.
10    Q.   Does this resume state, "Maintainer
11 and developer of BusyBox"?
12    A.   Yes, it does.
13    Q.   And is that accurate?
14         MR. RAVICHER:  Objection.
15         The document says, "BusyBox" parens,
16         again, "http:busybox.lineo.com)."
17    Q.   With that qualification, is that
18 statement accurate?
19    A.   Yes.
20    Q.   Okay.
21         MS. ROBERG-PEREZ:  I'm going to ask
22         the reporter to hand you a copy of the
23         complaint in this action that will be marked
24         as Exhibit 3.
25         (Exhibit Andersen 3, the complaint,

Erik Andersen - 10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 74

1 copyright in Version 0.60.3, correct?
2  A.  0.60.3, yes, that is the version
3 number --
4  Q.  Okay.
5  A.  -- on the registration.
6     MS. ROBERG-PEREZ:  Handing you a
7 document that I'd like the reporter to mark
8 as Exhibit 12.
9     (Exhibit Andersen 12, a copy of a web
10 page entitled, "Index of downloads," was
11 marked for identification at this time.)
12     MR. RAVICHER:  Take your time and
13 review it.
14     When we get to a stopping point, I'd
15 appreciate it.  I have a small bladder.
16     MS. ROBERG-PEREZ:  Okay.
17     MR. RAVICHER:  Thank you very much.
18     (Pause.)
19  A.  Okay.
20  Q.  I've handed you a copy of a web page,
21 five-page printout.  The title is: "Index of
22 downloads."
23     Do you see that?
24  A.  Yes, I see that.
25  Q.  And at the bottom of the printout,

Page 75

1 there is an address:
2 "Http:\\busybox.net\downloads\."
3     Did I read that correctly?
4  A.  I believe that's actually a forward
5 slash, but that's okay.
6  Q.  Forward slash.
7     With that correction, did I read that
8 correctly?
9  A.  Yes.
10  Q.  Do you recognize this web page?
11  A.  It appears to be a copy of the BusyBox
12 downloads that are available on busybox.net.
13  Q.  And what downloads are available on
14 busybox.net?
15  A.  Various versions of BusyBox dating
16 back to the 0.60.3 release, and versions then
17 after that.
18  Q.  Directing your attention to the 0.60.3
19 link on the first page, do you see that there is a
20 last-modified date, April 27th, 2002?
21     MR. RAVICHER:  Objection.
22     Just for clarification, there are two
23 BusyBox-0.60.3 files.  One's ".tar" --
24 T-A-R -- ".bz2."  The other one is
25 ".tar.bz2.sign."

Page 76

1 BY MS. ROBERG-PEREZ:
2  Q.  Mr. Andersen, directing your attention
3 to the link "BusyBox-0.60.3.tar.bz2," do you see
4 that there was a last-modified date, April 27th,
5 2002?
6  A.  Yes, I see that.
7  Q.  Do you have an understanding of what
8 the last-modified date means?
9  A.  Yes.
10  Q.  What does that date mean?
11  A.  That's the date on which that file
12 was -- was -- was last changed or modified, and --
13 and, presumably, it corresponds to the last time
14 anything in that file was changed.
15  Q.  And do you recognize -- let me back up
16 a bit.
17     At one point in time, you were a
18 BusyBox maintainer, correct?
19  A.  That is correct.
20  Q.  And were you a maintainer on
21 April 27th, 2002?
22  A.  Yes, I was.
23  Q.  And were you responsible for releasing
24 BusyBox Version 0.60.3?
25  A.  I was responsible for releasing

Page 77

1 BusyBox 0.60.3.
2  Q.  Were you responsible for releasing
3 documentation in connection with that code as
4 well?
5  A.  I created documentation with -- at
6 that time, yes.
7  Q.  And do you know if documents that we
8 downloaded from this page would be true and
9 accurate copies of the indicated source code?
10  A.  I presume that they are.
11  Q.  Do you have any reason to believe that
12 those copies would not be accurate?
13  A.  I believe I -- the dot sign file is --
14 contains cryptographic signature intended to
15 confirm that nobody's changed or modified it.
16  Q.  Okay.
17     Do you have any reason to believe that
18 the documentation in connection with the code that
19 is downloadable from these links would not be true
20 and accurate copies of the documentation?
21  A.  I have no reason to know one way or
22 the other whether the -- that that's true or
23 accurate or not.
24     I -- I would have to check it and see
25 if it had changed, or something, but I presume

20 (Pages 74 to 77)

Erik Andersen  -  10/29/2010
Software Freedom Conservancy, Inc., et al. vs Best Buy Co., Inc., et al.

Page 98

1  and John Beppu and Mark Whitley, working on
2  BusyBox while -- while working at Lineo?
3       MR. RAVICHER: Objection.
4     Q.  You may answer.
5     A.  I have no recollection of -- I -- I
6  don't recall.
7     Q.  If you know, where is John Beppu now?
8     A.  I have no idea.
9         After the -- after John Beppu was -- I
10 believe he was -- either quit or laid off, I
11 entirely lost contact with him.
12    Q.  If you know, where is Mark Whitley
13 now?
14    A.  I know Mark Whitley. He continues
15 to -- he lives in the Greater Salt Lake City area.
16 I believe it is in West Valley City.
17        And he -- last I had heard, he was
18 working doing software development for like --
19 like a bank or an insurance company, or some such
20 thing.
21    Q.  Okay.
22        I'd like to switch gears a little bit.
23        You've previously acknowledged that
24 Lineo has a copyright in BusyBox, correct?
25       MR. RAVICHER: Objection.

Page 99

1  BY MS. ROBERG-PEREZ:
2     Q.  You may answer.
3     A.  For -- while I was working there, it
4  was my hope to foster the development of BusyBox,
5  and it was my hope to further the interests of my
6  employer.
7         And, so, we -- I asked for and
8  obtained permission to create websites hosted by
9  Lineo, such as opensource.lineo.com, for the
10 purpose of promoting -- promoting embedded Linux
11 and promoting BusyBox.
12        And they also requested that I mark a
13 copyright notice in the -- the -- those releases
14 of BusyBox.
15    Q.  So, my answer is, correct, you have
16 previously acknowledged that Lineo has a
17 copyright --
18       MR. RAVICHER: Objection.
19    Q.  -- in BusyBox, correct?
20        You may answer it.
21    A.  There was never a registered copyright
22 that was registered with the copyright office.
23 However, it was marked in the source code that --
24 that they had a -- that they had claimed some
25 copyright in it.

Page 100

1     Q.  And it's the same copyright marking
2  that you attached to the source code?
3     A.  Could you restate that again?
4     Q.  Is this a copyright notice or marking
5  that you attached or marked --
6        MR. RAVICHER: Objection.
7     Q.  -- the source code with?
8        MR. RAVICHER: It's a little ambiguous
9  which copyright marking.
10    A.  Yeah, if you could clarify --
11    Q.  Okay.
12    A.  -- precisely what you're -- you're
13 asking, then I could.
14       MS. ROBERG-PEREZ: Okay. Let's strike
15 that question.
16        I'd like the reporter to hand you what
17 will be marked as Exhibit 15.
18        (Exhibit Andersen 15, a document
19 identified as TOC ID 14465, was marked for
20 identification at this time.)
21        (Pause.)
22    A.  Okay.
23       MR. RAVICHER: Do you mind, Counsel, a
24 few more moments.
25       THE WITNESS: Sure.

Page 101

1        (Pause.)
2        MR. RAVICHER: Thank you.
3  BY MS. ROBERG-PEREZ:
4     Q.  Handed you a two-page document.
5         There is a unique TOC ID number on the
6  bottom left: 14465.
7         Do you see that?
8     A.  Yes.
9     Q.  Do you see that this is an e-mail
10 exchange?
11        At the top of the first page, this is
12 from you, correct?
13    A.  Yes, it is.
14    Q.  To Dave Cinege?
15    A.  Yes.
16    Q.  Dated November 9th, 1999?
17    A.  So it seems --
18    Q.  Is this --
19    A.  -- yes.
20    Q.  -- is this a copy of the e-mail that
21 you sent?
22    A.  Appears to be, yes.
23    Q.  And looking at the top of this page,
24 there is an e-mail that Dave Cinege had written to
25 you, second paragraph: "In most files, you've

Erik Andersen  -  10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 102

1  made changes in I see only copyright 1999 by
2  Lineo, Inc."
3       Did I read that correctly?
4    A.  Yes.
5    Q.  Drawing your attention to the first
6  paragraph, about the middle of the page, do you
7  see that you have written back to Dave: "As for
8  the Lineo copyright, Lineo asked me to put that on
9  the stuff they paid me to work on. Since it is
10 their money, that is their right."
11      Did I read that correctly?
12   A.  Yes.
13   Q.  Is that something that you wrote?
14   A.  It appears to be, yes.
15   Q.  Is that something that is accurate?
16      MR. RAVICHER:  Objection.
17   A.  I don't recall the accuracy of what
18 they asked me to do or not do at this point.
19   Q.  But you agree that this is something
20 you wrote in November of 1999?
21      MR. RAVICHER:  Asked and answered.
22   Q.  You may answer it.
23   A.  Yes.
24   Q.  Okay.
25      MR. RAVICHER:  Just off the record

Page 103

1  real quickly.
2       (Discussion off the record.)
3       MS. ROBERG-PEREZ:  Perhaps going off
4  the record for a three-minute break.
5       MR. RAVICHER:  Okay.
6       VIDEOGRAPHER:  Going off the record at
7  11:19 a.m.
8       (Recess.)
9       VIDEOGRAPHER:  Going back on the
10 record at 11:24 a.m.
11 BY MS. ROBERG-PEREZ:
12   Q.  Mr. Andersen, I'd like the reporter to
13 hand you what will be marked as Exhibit 16.
14      (Exhibit Andersen 16, a group of
15 e-mails, was marked for identification at this
16 time.)
17      MR. RAVICHER:  Please take your time
18 and review the document completely.
19      (Pause.)
20   A.  Sometimes amuse myself, even after so
21 many years.
22   Q.  Mr. Andersen, do I take that that you
23 are ready to answer questions about the document?
24      MR. RAVICHER:  Counsel, if I can have
25 just a few for moments, please?

Page 104

1       Thank you.
2  BY MS. ROBERG-PEREZ:
3    Q.  Mr. Andersen --
4    A.  Yes.
5    Q.  -- are you ready to -- to answer
6  questions about this document?
7    A.  I believe I am.
8    Q.  Looking at the first page of the
9  document at the top of the page, do you see
10 there's reference to BusyBox Version 0.46?
11   A.  Yes, I see that reference.
12   Q.  And do you see that the date on this
13 document appears to be July 2000, July 7th, 2000?
14   A.  Well, I'm looking at what appears to
15 be a -- a diff, and it appears to be a diff
16 between the year 2000 and the -- presumably, the
17 beginning of the UNIX epoch at 1969.
18      MR. RAVICHER:  And just for
19 clarification for the record, the first line
20 of this document is
21 "diff-uNbusybox-0.46-orig/AUTHORS busybox-0_
22 46/AUTHORS."
23   Q.  Mr. Andersen, do you recognize what
24 this document is?
25   A.  Well, it appears to be a diff that was

Page 105

1  generated -- some kind of document, presumably,
2  from BusyBox 0.46.
3    Q.  What is a "Diff"?
4    A.  A diff is both a UNIX utility and the
5  output from that utility which generates a set of
6  differences between one text file and another text
7  file.
8    Q.  Is this a document that you created or
9  generated?
10   A.  I'm not sure where the diff came from
11 or how that was created, but it appears to be a --
12 a diff that is removing stuff from a file, and I'm
13 not sure who created the diff or why.
14   Q.  Okay.
15   A.  But the original content that the diff
16 was -- was created against appears to have come
17 from me.
18      So, at some point -- you know, so,
19 this is a derivative of something that I've
20 created.
21   Q.  Is it your testimony that you would
22 recognize original content from you that is in
23 this document even though you may not know who
24 created the diff?
25      MR. RAVICHER:  Objection.

Erik Andersen - 10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 110

1  Directing your attention back to
2  Exhibit 18.
3       You see that this is a document
4  entitled, at the top, "License."
5   A.  Yes, I see that it states that.
6   Q.  Do you see that, part way down the
7  page, there's reference to "Tons of new stuff as
8  noted in header files"?
9   A.  Yes, I see that.
10  Q.  "Copyright 1999, 2000, 2001, by Lineo
11 Inc. and written with Erik Andersen."
12      Do you see that?
13  A.  Yes, I see that.
14  Q.  As maintainer of BusyBox in
15 August 23rd of 2001, would you have been
16 responsible for the content of any license file
17 that was released when Version 0.60.1 was
18 released?
19  A.  Yes, I believe I would be.
20  Q.  And do you have any reason to believe
21 that this is not the license file that was
22 released with Version 0.60.1?
23  A.  I have no reason to know one way or
24 the other.  I would have to double-check it myself
25 to confirm, but it's plausible that this is it.

Page 111

1   Q.  Okay.
2       MS. ROBERG-PEREZ:  Asking the reporter
3  to hand you what will be marked as Exhibit
4  19.
5       (Exhibit Andersen 19, a document
6  identified as TOC ID 13626, was marked for
7  identification at this time.)
8       MS. ROBERG-PEREZ:  Going off the
9  record.
10      We'd like to change the tape now.
11      VIDEOGRAPHER:  We're going off the
12 record at 11:42 a.m.
13      (Recess.)
14      VIDEOGRAPHER:  We're going back on the
15 record at 11:43 a.m.
16 BY MS. ROBERG-PEREZ:
17  Q.  Mr. Andersen, Exhibit 19 has a unique
18 TOC identifier on the bottom left, 13626.
19      Do you see that?
20  A.  Yes, I see that.
21  Q.  Do you see that this appears to be an
22 e-mail from tbird@flint.lineo.com.
23      Do you see that?
24  A.  Yes, I see that.
25  Q.  Do you see from the footer at the

Page 112

1  bottom that this appears to be an e-mail from Tim
2  Bird?
3   A.  That is what it seems to be.
4   Q.  And that it's dated June 9th, 2000?
5   A.  Yep.
6   Q.  And that it is to Doug Brockbank?
7   A.  Yes.
8   Q.  Do you know who Doug Brockbank is?
9   A.  I recall him.  I do not recall off the
10 top of my head precisely what his position was.
11  Q.  Did he work at Lineo?
12  A.  But he did work at Lineo.
13  Q.  Do you see that this e-mail -- in this
14 e-mail, Tim states: "Doug, here's a list of major
15 open-source contributions made by Lineo, et al."?
16  A.  Yes, I see that that's what this
17 e-mail says.
18  Q.  And then at the bottom of the e-mail,
19 it says: "For PopTop, uClinux, ThinLinux,
20 BusyBox, and TinyLogin, these are open-source
21 projects where we are the owners that are the
22 leaders and primary contributors to the project."
23      Do you see that?
24      MR. RAVICHER:  Objection.
25      The e-mail puts the word "Owners" in

Page 113

1  quotes.  The word "Owners" is not left by
2  itself.  It -- it is surrounded by quotes.
3  BY MS. ROBERG-PEREZ:
4   Q.  With that correction, did I read those
5  two sentences at the bottom of this e-mail
6  correctly?
7   A.  Yes --
8   Q.  Okay.
9   A.  -- that is what this appears to say.
10      MS. ROBERG-PEREZ:  I'd like the
11 reporter to hand you what will be marked as
12 Exhibit 20.
13      (Exhibit Andersen 20, a document
14 identified as TOC ID 3836, was marked for
15 identification at this time.)
16      (Pause.)
17  A.  Okay.
18      MR. RAVICHER:  If I could have a
19 moment with this?
20      THE WITNESS:  Certainly.
21      (Pause.)
22      MR. RAVICHER:  Thank you.
23  Q.  Mr. Andersen, do see that this is a
24 two-page document with the unique Toc identifier
25 in the bottom left, 3836?

29 (Pages 110 to 113)

Depo International, Inc.
(763) 591-0535 or (800) 591-9722  admin@depointernational.com

Erik Andersen - 10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 130

1  Q. Did you receive legal assignment of
2  copyright from any BusyBox contributor?
3  A. To the best of my knowledge, no.
4  Q. Okay.
5  A. Some people may have chosen to submit
6  their stuff under public domain, but I do not
7  believe that there was ever a legal document of
8  formal assignment of copyright.
9      MS. ROBERG-PEREZ: I'll ask the
10     reporter to hand you what will be marked as
11     Exhibit 22.
12     (Exhibit Andersen 22, a document
13     identified as TOC ID 12947, was marked for
14     identification at this time.)
15 A. Okay.
16 Q. Do you see this is two-page document
17 with the unique identifier on the bottom left, TOC
18 12947?
19 A. Yes, I see that.
20 Q. And at the top of this e-mail chain,
21 there's an e-mail from julie.weight@lineo.com to
22 andersen@lineo.com?
23 A. Yes, I see that.
24 Q. And this is dated August 2nd, 2000,
25 correct?

Page 131

1  A. Yes.
2  Q. Is this an e-mail that you received?
3  A. Yes.
4  Q. Who is Julie Weight?
5  A. Presumably, a paralegal and -- who was
6  working for Lineo, Inc., as noted in the document.
7  Q. Do you have any independent
8  recollection of who she is?
9  A. Not -- not really, no.
10 Q. Okay.
11     I'd like to direct your attention to
12 the second page.
13     About halfway down the page, you have
14 written: "Software I am working on and/or
15 maintaining for Lineo."
16     Do you see that?
17 A. Yes, I see that.
18 Q. And do you see that you've identified
19 BusyBox as one of the -- one of the software
20 projects?
21 A. Yes, I see that.
22 Q. And do you see that under -- next to
23 copyright, you've written: "Me and about 50 other
24 people."
25 A. Yes, I see that.

Page 132

1      I suspect I was exaggerating the
2  numbers at that point, but it was nonetheless some
3  number of other people up to, but probably not
4  exceeding 50.
5  Q. Okay.
6      That leads right into the next
7  document we can talk about.
8      MS. ROBERG-PEREZ: I'd like to ask the
9  reporter to hand you what will be marked as
10     Exhibit 23.
11     (Exhibit Andersen 23, the author file
12     for Version 0.60.3, was marked for
13     identification at this time.)
14 A. Okay.
15 Q. I will represent to you that this is
16 the author file for Version 0.60.3.
17     You were the maintainer when Version
18 0.60.3 was released, correct?
19 A. That is correct.
20 Q. The top of this document, do you see
21 that it says: "List of the authors of code
22 contained in BusyBox"?
23 A. Yes, I see that.
24 Q. And do you see that there are 26
25 authors listed?

Page 133

1  A. Would you like me to count them?
2  Q. Certainly.
3  A. It does indeed seem to be 26.
4  Q. Did any of these other authors write
5  code that is in Version 0.60.3 of BusyBox?
6  A. I'm certain that that is the case.
7  Q. Looking at the list, can you identify
8  which of these authors those would be?
9  A. Well, having written the list of
10 authors, I'm certain that every one of these
11 people has some contribution to some extent, small
12 or large, that is incorporated into BusyBox
13 0.60.3.
14 Q. And just to be clear, when you say,
15 "Contribution," do you mean that there is code --
16 A. Yes.
17 Q. -- that is incorporated into 0.60.3?
18 A. Yes.
19 Q. Okay.
20     Did you -- when you registered your
21 BusyBox copyright at the copyright office, did you
22 tell the copyright office about the parts of the
23 code that any of these other authors wrote?
24 A. No.
25 Q. Okay.

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com

Erik Andersen  -  10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 142

```
 1    A.   No.
 2    Q.   Has the sale of the -- any of the
 3  devices accused in this litigation had any impact
 4  on any of your businesses?
 5         MR. RAVICHER:  Objection.
 6    Q.   You may answer.
 7    A.   The impact that this would have on my
 8  businesses would presumably be primarily limited
 9  in my particular case to the potential impact it
10  might have upon my reputation within the software
11  development community, my reputation and ability
12  to derive consulting income associated with the
13  software, and I suppose it might create a broader,
14  chilling effect upon those performing similar
15  services that are available for the same software.
16    Q.   Okay.
17         Mr. Andersen, I'd like to talk about
18  each of those things.
19         You testified that it might have
20  potential impact on your reputation.
21         As you sit here today, are you aware
22  of any impact that the sale of the accused devices
23  has had on your reputation?
24    A.   Both my reputation and the reputation
25  of GPLed software in general, those who are -- are
```

Page 143

```
 1  considering professions, those who are in school
 2  studying computer science, those who are hobbyists
 3  who find enjoyment working with and modifying
 4  Linux devices, and skilled end users who wish to
 5  create their own alternative firmware for devices,
 6  all these people depend upon the freedom to modify
 7  and to update their own devices.
 8         When software is released in such a
 9  manner that it is not compliant with the GPL, and
10  despite being GPLed software, it produces a
11  general chilling effect on both my reputation and
12  the community at large because it creates a
13  perception that creating and developing software
14  for Linux, or software licensed under the GPL, is
15  a waste of time because other corporations will
16  simply take your stuff and close it up without
17  passing on the freedoms that they were given.
18         That also has a tendency to encourage
19  small firms to say, well, if Company A was able to
20  get away with it, and they didn't have to comply,
21  perhaps we don't have to comply either.  And that
22  creates a generally depressive perception in the
23  marketplace and reduces the ability of individual
24  consultants and consulting companies to then apply
25  their trade and earn a living developing and
```

Page 144

```
 1  enhancing the software and creating customizations
 2  for companies that need it.
 3    Q.   Okay.
 4         Well, let's unpack that a little bit.
 5         Can you tell me of specific instances
 6  in which your reputation specifically, not GPLed
 7  software, not the community, yours specifically,
 8  has been adversely affected because of the sale of
 9  any of the accused devices?
10    A.   Having not recently looked around the
11  Internet of people who have been discussing Erik
12  Andersen in connection with the particular accused
13  devices, I am not personally aware of anyone who
14  has discussed in particular the damage caused to
15  err Rick Andersen, or who has in particular
16  maligned me for specifically the Blu-ray players
17  in question.
18    Q.   You also testified that the sale of
19  the accused devices might encourage small firms to
20  not comply with the GPL.
21         As you sit here today, can you name
22  any small firm, small company, any entity that,
23  because of the sale of the accused devices, is now
24  not complying with the GPL?
25    A.   I guess it goes to a general, broader
```

Page 145

```
 1  market perception.  When you ask for a specific
 2  name, I cannot easily provide a specific name of a
 3  specific company who has through a broader
 4  perception decided that specifically because of
 5  the one -- of the infringing -- the alleged
 6  infringing devices has specifically decided that
 7  that was the one and only reason why they were
 8  going to try and release their own software that
 9  was G -- that was GPL licensed, and, yet, not
10  specifically for that device, comply with the
11  license solely on the basis of these particular
12  devices.
13    Q.   Okay.
14         Can I ask what is the basis of your
15  general broader market perception belief?
16    A.   This is a general belief of mine that
17  has developed over a number of years as I
18  developed BusyBox, as I maintained BusyBox, as I
19  saw the use of BusyBox blossom, and as it was
20  incorporated into literally millions of devices.
21         During that time, from -- as it was
22  adopted throughout various market segments, I also
23  saw it increasingly adopted and used in ways that
24  were not compliant with the license and -- and my
25  efforts initially, until I began working with my
```

Erik Andersen  -  10/29/2010
Software Freedom Conservancy, Inc., et al. vs Best Buy Co., Inc., et al.

Page 146

1  colleagues at the Conservancy and the Software
2  Freedom Law Center, my perception was that it was
3  widely perceived in the marketplace and -- that
4  people were able to, and companies were able to,
5  use the software and distribute products based on
6  the software without compliance with the license
7  with impunity.
8        And that perception, and -- and the
9  growing prevalence of reports that I would receive
10 from end users of these devices would -- did, in
11 my mind, create the belief that this was a wide,
12 prevalent perception throughout the marketplace.
13    Q.  How prevalent?
14    A.  How prevalent?
15        It was my perception that there were a
16 very large number of infringing devices being
17 shipped by a very large number of companies.
18        My understanding is that -- that there
19 have been times when there are many hundreds of
20 devices, individual devices, that are -- have --
21 that have been reported to have potential
22 infringement, and that number is not getting
23 smaller.
24        MR. RAVICHER:  When we get to a
25    stopping point, if we could take a break, I

Page 147

1  appreciate it.
2        MS. ROBERG-PEREZ:  Absolutely.
3    Q.  You mentioned getting reports from end
4  users.
5    A.  Yes.
6    Q.  Please name an end user that has
7  reported to you their concern.
8    A.  Down the street from me there was a
9  man by the name of Wade Barrier and Wade received
10 from the -- a DSL modem.
11        This device apparently contained
12 BusyBox, and it did not suit his needs for his
13 local network.  He wished to be able to assign
14 specific IP addresses to specific devices, and
15 this DSL modem lacked the ability to -- to perform
16 that function.
17        Wade proceeded to write a patch for
18 BusyBox in order to incorporate the feature set
19 that he wished to have on his home network.
20 Unfortunately, because this device was an
21 infringing device, the necessary source code,
22 Makefiles, build scripts, et cetera, were lacking.
23 And, therefore, he was not able to modify his
24 device.
25    Q.  Okay.

Page 148

1        I understand that this is Mr. Wade
2  Barrier's experience.
3        Do you personally have a similar
4  experience?
5    A.  I own, as an example, a Linksys --
6  several Linksys WRT54G wireless routers, and when
7  I initially purchased these routers, I was not
8  able to modify the software on it in order to --
9  to incorporate the functionality I wished.
10       In collaboration with my colleagues,
11 we were able to obtain compliance from the vendor,
12 and I now have these Linksys routers which contain
13 customized versions of -- of the software that are
14 able to perform the needs that I had for these
15 devices in my own home network.
16    Q.  Do you have any other similar
17 experience?
18    A.  Nothing recent comes to mind.
19    Q.  Going farther back, do you have any
20 experience previously, that's not recent?
21    A.  I -- no.
22    Q.  And with respect to the Linksys
23 routers that you just testified to, those aren't
24 manufactured by Best Buy, are they?
25    A.  No.

Page 149

1    Q.  Those aren't sold by Best Buy, are
2  they?
3    A.  No.
4        MR. RAVICHER:  Objection.
5    A.  Well, I -- they might be, I don't
6  know.
7        The ones I purchased were not sold by
8  Best Buy.
9    Q.  Okay.
10       Those weren't manufactured with JVC,
11 were they?
12    A.  I would presume not.
13    Q.  Those weren't manufactured by Western
14 Digital, were they?
15    A.  No.
16    Q.  Okay.
17       MS. ROBERG-PEREZ:  There will be a
18 tape change in five minutes.  Perhaps we can
19 take a ten-minute break now.
20       Going off the record.
21       VIDEOGRAPHER:  Going off the record at
22 2:20 p.m.
23       (Recess.)
24       VIDEOGRAPHER:  This marks the start of
25 Tape No. 5.

38 (Pages 146 to 149)

Erik Andersen - 10/29/2010
Software Freedom Conservancy, Inc., et al. vs. Best Buy Co., Inc., et al.

Page 150

1   We're going back on the record at
2   2:36 p.m.
3   BY MS. ROBERG-PEREZ:
4       Q.  Mr. Andersen, before our break, you
5   spoke about not recently looking around the
6   Internet now for information or postings about --
7   about your reputation.
8       Aside from Internet postings, do you
9   have any other awareness of any way in which your
10  reputation has been harmed because of the sale of
11  the accused devices?
12      A.  Because of the sale of these specific
13  accused devices, I have no knowledge.
14      Q.  Okay.
15      I'd like to ask if you have any
16  concrete examples of how you have lost business
17  because of the sale of the accused devices?
18      We can start with Perlustro --
19  Perlustro: Are you aware of any business that
20  Perlustro has lost because of the sale of the
21  accused devices?
22      A.  No, both Perlustro and Extreme
23  Forensics and Andersen Forensics are really
24  entirely orthogonal.  They have nothing -- no
25  correlation with -- with the -- the software in

Page 151

1   question, so ...
2       Q.  So, the answer is, you're not aware of
3   any loss of business?
4       A.  That's correct.
5       Q.  Okay.
6       Are you -- can you give me a concrete
7   example of any business that CodePoet Consulting
8   has lost because of the sale of the accused
9   devices?
10      A.  I cannot give you a specific example
11  of any business that has been lost by CodePoet
12  Consulting.
13      Q.  Okay.
14      Anyone who wants access to the BusyBox
15  code that you registered at the copyright office
16  has access to that code today, correct?
17      A.  Yes, that is correct.
18      Q.  That code can be downloaded from an
19  online repository, correct?
20      A.  That is correct.
21      Q.  And the sale of the accused devices
22  has not changed that, has it?
23      A.  It has not -- not changed that, no.
24      Q.  The sale of the accused devices hasn't
25  decreased the number of people using BusyBox code

Page 152

1   that you wrote, has it?
2       MR. RAVICHER:  Objection.
3       Q.  You may answer.
4       A.  I have no ability to speculate as to
5   what other people may or may not have done.
6       Q.  So, your only answer would be
7   speculative, so you can't say, correct?
8       A.  That is correct.
9       Q.  Okay.
10      Are you aware of alternatives to
11  BusyBox code generally?
12      A.  I believe that there probably exists
13  alternatives.  People are more than welcome to --
14  to use alternative operating systems.  They are
15  also perfectly able to go and use other source
16  code on Linux.
17      So, for example, if someone did not
18  wish to use BusyBox, they could download Verio and
19  compile for themselves various other GPLed
20  software available from the GNU and other sources
21  that could, you know, when properly compiled up,
22  replace BusyBox, although, obviously, it would
23  incur quite a bit more size and space as far as
24  the storage required and the memory required to
25  run those -- those other utilities.

Page 153

1       Q.  Aside from other GPLed software, are
2   you aware of any other alternatives to BusyBox
3   code?
4       A.  Certainly, there are commercial
5   realtime operating systems that people are able to
6   purchase, and one would have to speak to those
7   other vendors of other realtime operating systems
8   or embedded operating systems to see what
9   alternatives they had that may or may not be a,
10  you know, direct correlation.
11      Q.  Okay.
12      And aside from other GPLed code and
13  commercial code, are you aware of any other code
14  that perhaps is open source, just not GPLed that
15  would serve or could serve as an alternative to
16  BusyBox?
17      A.  There might be pieces and parts
18  that -- but I am not aware of anything that, as an
19  aggregate, is able to wholly replace all
20  functionality of BusyBox that is available under
21  other license terms, but my awareness of such
22  things doesn't mean that they don't exist or not
23  exist.
24      Q.  And you did testify that there may be
25  pieces and parts, correct?

Depo International, Inc.
(763) 591-0535 or (800) 591-9722 admin@depointernational.com