UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

SOFTWARE FREEDOM
CONSERVANCY, INC., and ERIK
ANDERSEN,

                    Plaintiffs,

          - against -

BEST BUY CO., INC.,
WESTINGHOUSE DIGITAL
ELECTRONICS, LLC, WESTERN
DIGITAL TECHNOLOGIES, INC.,
PHOEBE MICRO, INC., ZYXEL
COMMUNICATIONS INC., WESTERN
DIGITAL CORPORATION, and
WESTINGHOUSE DIGITAL, LLC,

              Defendants.

-------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 10155 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/14/11

SHIRA A. SCHEINDLIN, U.S.D.J.:

# I.    INTRODUCTION

       On December 14, 2009, the Software Freedom Conservancy, Inc. and

Erik Andersen ("plaintiffs") brought this action against fourteen commercial

electronics distributors for copyright infringement.[1]  Plaintiffs allege that

Westinghouse Digital LLC ("WD") is a successor in interest to one of those

distributors, Westinghouse Digital Electronics, LLC ("WDE"), and move to join

---

     [1]     *See* Complaint ("Compl.") ¶ 1.

WD as a defendant pursuant to Rule 25(c) of the Federal Rules of Civil Procedure.[2]

For the reasons discussed below, plaintiffs' motion is denied.

## II.   BACKGROUND

### A.   Overview

WDE was founded in 2002 as an independent designer, developer and distributor of a range of display products including liquid crystal display televisions and monitors.[3]   In 1999, Andersen developed software, which he contributed to an open source computer program known as BusyBox.[4]   Andersen later registered a copyright in the code.[5]   According to plaintiffs, WDE distributed the copyrighted BusyBox software — without plaintiffs' permission — within its

---

[2]      *See* Plaintiffs' Memorandum of Law in Support of Its Motion to Join Successors in Interest of Defendant Westinghouse Digital Electronics, LLC ("Pl. Mem.") at 3.   The Standard for joinder under Rule 25(c) is discussed in the Court's previous opinion and order.   *See Software Freedom Conservancy, Inc. v. Best Buy Co., Inc.*, No. 09 Civ. 10155, 2010 WL 4860780 (S.D.N.Y. Nov. 29, 2010) ("*Software Freedom I*").

[3]      *See* 3/18/10 Fairness Opinion Prepared at the Request of Nexis, Inc. ("Fairness Op."), Ex. 1 to Binder of Materials Entered into Evidence during Evidentiary Hearing, at 3.

[4]      *See* 6/1/10 Declaration of Erik Andersen, plaintiff, in Support of Motion for Default Judgment, or in the Alternative, Summary Judgment against Defendant Westinghouse Digital Electronics, LLC ("Andersen Decl.") ¶¶ 3-4.

[5]      *See id.*

High Definition Television ("HDTV") products.[6]

From 2007 through 2009, WDE experienced significant operating losses and its revenue decreased by seventy-seven percent.[7] With these mounting losses, WDE also experienced severe liquidity problems.[8] On April 2, 2010, WDE executed an assignment for the benefit of creditors under California law in favor of Credit Managers Association of California d/b/a Credit Management Association ("CMA"), a California non-profit corporation.[9] CMA assists insolvent companies with work-outs or liquidations through alternatives to bankruptcy, including the

---

[6]    *See* Compl. ¶¶ 26-27.

[7]    *See* Fairness Op. at 6-7.

[8]    *See id.* at 7 ("[WDE] has been able to remain in business through the combination of funding from outside entities and aggressive management of its vendor payments.  However, WDE has reached a point where it can no longer draw upon these liquidity options.").

[9]    *See* Pl. Mem. at 2-3. An assignment for the benefit of creditors is a device under California state law by which an insolvent company may liquidate without filing for federal bankruptcy. *See Credit Mgrs. Assoc. of S. Cal. v. National Indep. Bus. Alliance*, 162 Cal. App. 3d 1166, 1169 (Cal. Ct. App. 1984). "The assignment is an assignment of all of the [assignor's] assets that are transferable and not exempt from enforcement of a money judgment." Cal. Code Civ. Proc. § 493.010.  "The assignment is for the benefit of all the [assignor's] creditors." *Id. Accord* Respondent Credit Managers Association of California's Memorandum in Opposition to Plaintiffs' Motion for Joinder ("CMA Opp. Mem.") at 4.

3

general assignment for the benefit of creditors.[10]  CMA assumed all of WDE's

assets and liabilities and simultaneously sold a significant majority of those assets

to Golden Star Electronics, LLC, which subsequently changed its name to

Westinghouse Digital LLC ("WD").[11]  The assets purchased by WD included the

infringing HDTVs and web servers containing plaintiffs' BusyBox software.[12]

Shortly after the sale ("Asset Sale"), WDE, now without any assets or liabilities,

changed its name to Mora Electronics LLC ("Mora").[13]

       As part of the Asset Sale, WD paid five hundred thousand dollars in

cash to CMA and agreed to pay a percentage of future royalties up to one and a

half million dollars.[14]  WD also assumed approximately eighteen million dollars of

---

[10]     *See* CMA Opp. Mem. at 4.

[11]     *See* Fairness Op. at i.

[12]     *See* Respondent Westinghouse Digital, LLC's Memorandum in
Opposition to Plaintiffs' Motion for Joinder ("WD Opp. Mem.") at 6.

[13]     *See id. Accord* Deposition of Adam Meislik, principal of XRoads
Solutions Group ("XRoads"), in Support of the Fairness of the Asset Purchase
("Meislik Dep."), Ex. B to Binder of Materials Entered into Evidence during
Evidentiary Hearing, at 53: 22-25 ("Q: In your understanding, then, Westinghouse
Digital Electronics assigned all of its assets to Credit Management Association? A:
That's my understanding, and liabilities.").

[14]     *See* April 2010 Asset Purchase Agreement Between Golden Star
Electronics, LLC and Credit Management Association ("Purchase Agreement"),
Ex. 9 to Binder of Materials Entered into Evidence during Evidentiary Hearing, at
8.  The royalty consisted of $1.50 per television sold up to a total of one and a half
million dollars.  *See* Fairness Op. at 1.

WDE's liabilities.[15]  Prior to the Asset Sale, WDE had engaged XRoads to render

an opinion as to the fairness of the Asset Sale.[16]  XRoads concluded that the Asset

Sale would be fair to WDE's creditors because the creditors stood to recover more

under the Asset Sale than under a liquidation,[17] which XRoads believed would

have been likely given the dire state of WDE's financial situation and its lack of

financial alternatives.[18]

---

[15]     *See* Pl. Mem. at 2-3.

[16]     Notably, the valuations of WDE's assets and liabilities used by
XRoads varied drastically from those used by CMA.  XRoads had valued WDE's
assets as of February 28, 2010 at $12.3 million and its liabilities at $50.8 million.
*See* Fairness Op. at 2.  CMA, in its creditor bulletin, showed WDE's assets as of
April 2, 2010 (the Asset Sale date) at $1.6 million and liabilities at $42 million.
CMA Opp. Mem. at 5.  During his deposition, Meislik attributed this difference
mainly to transactions that occurred after the publication of the Fairness Opinion.
*See* Meislik Dep. at 57: 3-19.  Meislik stated that he now believes the asset value
was closer to the $1.6 million figure CMA reported and perhaps even less.  *See id.*
at 60: 3-7 ("Q: . . . do you believe that the total assets of Mora actually assigned to
CMA was less than $1.6 million? A: My view of it will be that it's less than $1.6
million at this point in time.").

[17]     *See* Fairness Op. at 3 ("The [Asset Sale] is estimated to provide a
7.9% recovery for [WDE's] general unsecured creditors . . . If the [Asset Sale]
does not occur and WDE is forced into a liquidation event, the estimated cash
proceeds could provide a 4.1% recovery for [WDE's] general unsecured creditors .
. . . Accordingly, the contemplated [Asset Sale] is estimated to provide a larger
recovery for [WDE's] general unsecured creditors.").

[18]     *See id.* ("Without an approved assignment of the Westinghouse
trademark to a buyer acceptable to [the licensor of the Westinghouse trademark]
and a transfer of the Assumed Liabilities to a third-party buyer, the likelihood of
the Assigned Assets remaining intact as a profit-seeking business enterprise is

### B.    Court Proceedings

In July of 2010, this Court granted plaintiffs' motion for a default judgment against WDE and awarded plaintiffs permanent injunctive relief as well as damages.[19]  In August of 2010, Plaintiffs sought to join WD and CMA as defendants under Rule 25(c) as WDE's successors in interest.[20]  This Court denied plaintiffs' motion to join CMA; their motion to join WDE was stayed pending an evidentiary hearing on the issues of whether the Asset Sale amounted to a merger between WDE and WD and whether WD substantially continued WDE's business.[21]  Upon consideration of the evidence presented at that hearing,[22] and reconsideration of the parties' arguments, plaintiffs' motion to join WDE is denied.

## III.   APPLICABLE LAW

### A.    Successor in Interest Liability Under California Law

Generally, "where a corporation sells or otherwise transfers all of its

---

doubtful.  WDE would likely be forced to cease operating and to liquidate its assets to realize cash proceeds.").

[19]     *See Software Freedom Conservancy, Inc. v. Best Buy Co., Inc.*, No. 09 Civ. 10155, 2010 WL 2985320 (S.D.N.Y. July 27, 2010).

[20]     *See* Pl. Mem. at 3.

[21]     *See Software Freedom I*, 2010 WL 4860780, at *7.  I have not reconsidered any of plaintiffs' other arguments for successor liability.

[22]     *See* Transcript of Evidentiary Hearing held on 2/22/11 ("2/22/11 Tr.").

assets, its transferee is not liable for the debts and liabilities of the transferor."[23]

However, California courts have recognized certain exceptions to the general rule

of nonliability where

> (1) the purchaser expressly or impliedly agrees to such
> assumption, (2) the transaction amounts to a consolidation or
> merger of the two corporations, (3) the purchasing corporation is
> merely a continuation of the selling corporation, or (4) the
> transaction is entered into fraudulently to escape liability for
> debts.[24]

There is also an additional judicially created exception, known as the "product line

successor" rule, which applies when a person has been injured by the predecessor's

product.[25]

### 1.    Assumption of Liabilities

To find an assumption of liability, a court must first consider the

language of the Purchase Agreement itself.[26]  If the language of the contract is clear

and the contract itself is fully integrated, the court will adhere to the contract's

---

[23]    *Schwartz v. McGraw-Edison Co.*, 14 Cal. App. 3d 767, 780 (Cal. Ct.
App. 1971).

[24]    *Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 621 (Cal. Ct. App.
2001) (quotations and citations omitted).

[25]    *See id.* (citing *Ray v. Alad Corp.*, 19 Cal. 3d 22 *passim* (Cal. 1997)).

[26]    *See id.* (looking to the contract to determine if a corporation assumed
the liabilities of another) ("We must consider the language of the purchase
agreement itself.").

plain language and will not consider extrinsic evidence.[27]

### 2.   Mere Continuation and De Facto Merger

In order to determine whether a purported asset sale is a de facto

merger, courts consider the following factors:

> (1) was the consideration paid for the assets solely stock of the purchaser
> [or] its parent; (2) did the purchaser continue the same enterprise after
> the sale; (3) did the shareholders of the seller become the shareholders
> of the purchasers; (4) did the seller liquidate; and (5) did the buyer
> assume the liabilities necessary to carry on the business of the seller?[28]

Although the mere continuation and de facto merger theories have traditionally

been considered separate grounds for finding successor liability, courts have

perceived "the second to be merely a subset of the first."[29]  "The crucial factor in

determining whether a corporate acquisition constitutes either a de facto merger or

a mere continuation is the same: whether adequate cash consideration was paid for

---

[27]     *See id.* ("[B]ecause the unambiguous contract was expressly
integrated, it was improper to consider extrinsic evidence to vary or alter its
terms.") (citing *Chknova v. Wilbur-Ellis Comp.*, Cal. App. 4th 962, 968 (1999)
("Matters extrinsic to an integrated contract will not be considered to modify the
unambiguous language of those contracts.")).

[28]     *Id.* at 626 (citing *Marks v. Minnesota Mining and Mfg. Co.*, 187 Cal.
App. 3d 1429, 1436 (Cal. Ct. App. 1986)).

[29]     *Id.* at 625.

the predecessor corporation's assets."[30]

In applying the mere continuation theory, liability will be imposed on a successor corporation "only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors or stockholders of both corporations."[31]  Although these two factors were listed in the disjunctive, "a review of the cases cited by the *Ray v. Alad* court . . . reveals that all of the cases involved the payment of inadequate cash consideration, and some also involved near complete identity of ownership, management or directorship after the transfer."[32]  Therefore, "although other factors are relevant to both the de facto merger and mere continuation exceptions, the common denominator, which must be present in order to avoid the general rule of successor nonliability, is the payment of inadequate consideration."[33]

In order for a court to find inadequate consideration, "there must be a

---

[30]     *Id.*

[31]     *Ray*, 19 Cal. 3d at 29.

[32]     *Franklin*, 87 Cal. App. 4th at 627.

[33]     *Id.*

9

causal relationship between a successor's acquisition of assets (i.e., inadequate consideration), and the predecessor's inability to pay its creditors."[34] "The requirement of inadequate consideration in a successor liability case is premised on the notion that when a successor corporation acquires the predecessor's assets without paying adequate consideration, the successor deprives the predecessor's creditors of their remedy."[35] Therefore, "[w]here the predecessor files bankruptcy and its debts are discharged . . . it is the discharge and the lack of sufficient assets that deprive the predecessor's creditors of their remedy, not the acquisition of the predecessor's assets by another entity."[36]

## IV.  DISCUSSION

### A.    Assumption of Liabilities

Section 2.3(n) of the Purchase Agreement, entitled "Litigations and Claims Not Assumed," lists this current action as one of the litigation claims

---

[34]    *Katzir's Floor and Home Design v. M-MlS.com*, 394 F.3d 1143, 1151 (9th Cir. 2004) (citing *Monarch Bay II v. Professional Serv. Indus., Inc.*, 75 Cal. App. 4th 1213, 89 (Cal. Ct. App. 1999)).

[35]    *Id.*

[36]    *Id. Accord Sunnyside Dev. Co. v. Opsys Ltd.*, No. C 05 0553, 2010 WL 2462142, at *10 (N.D. Cal. Aug. 29, 2007) ("Where it is a 'lack of sufficient assets that deprives[s] the predecessor's creditors of their remedy, not the acquisition of the predecessor's assets by another entity,' successor liability cannot attach based on a theory of mere continuation.") (quoting *Katzir's Floor*, 394 F.3d at 1151).

excluded from the transaction and not to be assumed by WD.[37]  Therefore, the

Purchase Agreement unambiguously shows that the liabilities relating to this

current action are not among those assumed by WD.  Thus, assumption of

liabilities cannot serve as a basis for successor liability.

### 2.    Inadequate Consideration

WD directs the Court's attention to *Katzir's Floor*, emphasizing its

holding that the inadequacy of consideration must be the cause of the predecessor's

inability to pay its creditors in order to find successor liability.  WD argues further

that "[h]ere, it is clear that Mora was insolvent . . . before its assignment to CMA

and before the asset sale to WD;" therefore, the "creditor's inability to get paid . . .

is not caused by CMA's sale to WD (which actually benefits creditors by

liquidating property into cash for distribution), but rather by Mora's pre-existing

insolvency."[38]  Indeed, the Fairness Opinion, which was not before the Court on

---

[37]    *See* Purchase Agreement at Schedule 2.3(n).

[38]    Def. Mem. at 16.  I note that the facts of *Katzir's Floor* are not
completely analogous.  The predecessor corporation in *Katzir's Floor* was not
merely "insolvent;" the corporation actually went into an involuntary receivership
and the receiver sold the assets to the alleged successor corporation.  *See Katzir's
Floor*, 394 F.3d at 1147.  Furthermore, the takeover by the receiver and the asset
sale were distinct transactions, making clear that it was the lack of sufficient assets
that deprived the creditors of their recovery and not the amount of consideration
paid for the assets.  *See id.*  Here, the assignment for the benefit of creditors and the
asset acquisition occurred simultaneously, making it more difficult to determine
which factor caused plaintiffs' inability to recover.  *See* Fairness Op. at 1.  This

plaintiffs' original motion, found that WDE "ha[d] no enterprise value as a going-

concern business . . . . Accordingly, the contemplated Transaction is estimated to

provide a larger recovery for [WDE's] general unsecured creditors."[39]  Plaintiffs'

reply brief ignores *Katzir's Floor* and presents no evidence as to how WD's

inadequate consideration rather than WDE's lack of financial alternatives to the

---

distinction between *Katzir's Floor* and the case at bar, however, does not alter my
finding of adequate consideration because of plaintiffs' failure to show a causal
link between WD's inadequate consideration and plaintiffs' inability to recover.

[39]      Fairness Op. at 3.  On plaintiffs' original motion, I reasoned that
"[f]ive hundred thousand dollars plus one million five hundred thousand dollars of
future royalties is inadequate cash consideration for [WDE's] assets" because "[a]n
estate with only five hundred thousand dollars in cash will certainly leave many
creditors 'out of the money.'"  *Software Freedom I*, 2010 WL 4860780, at * 5.
However, evidence submitted by WDE during the evidentiary hearing and now
before the Court compels a different result.  Drawing all reasonable inferences in
plaintiffs' favor on their original 25(c) motion, *see Luxliner P.L. Export Co. v.
RDI/Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993), the consideration appeared to be
inadequate as a matter of law.  However, in my capacity as a fact-finder following
an evidentiary hearing – during which plaintiffs submitted no evidence disputing
the Fairness Opinion's conclusion that the creditors were able to recover more
under the Asset Sale than in a liquidation, *see id.* at 72-73 – I now conclude that
the consideration was adequate.  Plaintiffs have surely not carried their burden to
show that the consideration was *inadequate.*

12

Asset Sale[40] deprived plaintiffs of their recovery.[41]  Given the absence of such

evidence, I am constrained to find that plaintiffs have failed to demonstrate

inadequate consideration.[42]

       Plaintiffs emphasize the other factors courts consider to find a mere

continuation or a de facto merger.  Plaintiffs have produced evidence showing an

overlap of employees between WDE and WD,[43] that WDE liquidated[44] and that the

liabilities assumed by WDE were merely the liabilities necessary to carry on the

business of WD.[45]  However, unlike the causal relationship between the inadequate

---

[40]     *See* Fairness Op. at 3.  *Accord* Meislik Dep. at 31: 6-12 ("WDE was
not a going-concern business anymore in our opinion . . . if they had nobody to sell
it to, they would have had to just liquidate the assets. That was their alternative.").
*See also id.* at 69: 4-7 ("Q: Do you have any personal knowledge of whether CMA
received any other bids? A: My recollection is they did not receive any other
bids.").

[41]     Plaintiffs were especially critical of the Fairness Opinion's reliance on
WD's promise of $1.5 million in future royalties.  *See* 2/22/11 Tr. at 39.  This line
of argument does little to address the fact that WDE was no longer a going concern
and had limited financial alternatives to the Asset Sale.

[42]     *See Maloney*, 207 Cal. App. 3d at 4 (holding that the party asserting
successor liability bears the burden of establishing inadequate consideration).

[43]     *See* 8/2/10 WD's response to defendant Darwin Chang's Special
Interrogatories, Set One ("WD Interrogatories"), Ex. 8 to Binder of Materials
Entered into Evidence during Evidentiary Hearing, at 7-9.

[44]     *See* WD Opp. Mem. at 6.

[45]     *See* Fairness Op. at 1. ("It is our understanding that the Assumed
Liabilities are owed to entities in which WDE maintains valuable vendor

13

consideration and the creditors' inability to recover, these factors are not dispositive.[46] Because plaintiffs have failed to prove the "crucial factor" of inadequate consideration, their de facto merger and mere continuation theories of successor liability must fail.

## V.   CONCLUSION

For the foregoing reasons, plaintiffs' motion to join WD is denied. The Clerk of the Court is directed to close this motion (Docket No. 133).

---

relationships and been deemed critical to the future success of any continuing business enterprise involving the Westinghouse trademark."). *Accord* Meislik Dep. at 78: 6-13 ("Q: CMA then sold roughly half of those liabilities or the book value of those liabilities to Golden Star; is that correct? A: . . . the liabilities that Golden Star felt like it needed to take on to assume in order to run the business went to Golden Star.").

[46]     *See Maloney*, 207 Cal. App. 3d at 288-89 (finding that there was no mere continuation when plaintiffs were unable to prove inadequate consideration even though the purported successor corporation held itself out as a continuation of the predecessor and there was an overlap of employees) ("Plaintiffs correctly point out that the relationship between APC I and APC II involved two characteristics which can contribute to a finding that one corporation is a mere continuation of the other . . . . Plaintiffs, however, present no argument as to how the presence of these two characteristics can make up for the absence of the essential ingredient of inadequate consideration.  In the absence of that ingredient, APC II is not a mere continuation of APC I.").

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 14, 2011

15

## - Appearances -

**For Plaintiffs (Software Freedom Conservatory, Inc. and Erik Andersen):**

Daniel B. Ravicher, Esq.
Aaron Williamson, Esq.
Michael A. Spiegel, Esq.
Software Freedom Law Center
1995 Broadway, 17th Floor
New York, New York 10023-5882
(212) 580-0880

**For Respondent (Westinghouse Digital, LLC):**

Barry M. Kazan, Esq.
Thompson Hine LLP
335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680

**For Non-party (Westinghouse Digital Electronics, LLC):**

Kyle Bradford Fleming, Esq.
Baker & Davis
111 East Wayne Street, Suite 800
Fort Wayne, Indiana 46802
(216) 861-7374

Sarah Hawa Bawany Yousuf, Esq.
Balber, Pickard, Battistoni, Maldonado, & Van Der Tuin
1370 Avenue of the Americas
New York, New York 10019
(212) 246-2400

16